[No. 3544.    Decided April 5, 1901.]

JOHN L. STANLEY, *Respondent*, v. ELLA MURPHY STANLEY, *Appellant.*

DIVORCE — CRUEL TREATMENT — PLEADING — CONCLUSIONS.

A complaint for divorce on the ground of cruel treatment is demurrable for want of facts when the allegations that defendant is quarrelsome and vicious in disposition and murderous in threats against plaintiff and his mother are mere conclusions, without any specification of what defendant's acts or threats were, or how or when made, and when in none of the allegations setting up cruel treatment is there any specification of such facts as tend to establish injury to the health or person of plaintiff.

SAME — INABILITY TO LIVE TOGETHER.

Under Bal. Code, § 5716, which provides that "a divorce may be granted upon application of either party for any other cause deemed by the court sufficient, and the court shall be satisfied that the parties can no longer live together," the mere fact that plaintiff believes he and defendant can no longer live together affords no legal cause for divorce.

SAME — SUFFICIENCY OF EVIDENCE — NON-SUIT.

In an action for divorce on the ground of cruel treatment, plaintiff should be non-suited, where his testimony shows that he was fully acquainted with the character of defendant prior to marriage, that he had failed to provide for her, that they lived together only about five months after marriage, that he

·abandoned her within one week after the birth of their child, and that her threats against his life and that of her child were called forth by his refusal to live with her again.

Appeal from Superior Court, King County.—Hon. ORANGE JACOBS, Judge. Reversed.

*W. F. Hays,* for appellant.

The opinion of the court was delivered by

REAVIS, C. J.—Appeal from decree of divorce. The complaint is substantially as follows: Paragraph 1 alleges residence of both plaintiff and defendant in King county for more than nine years last past. Paragraph 2 avers that when plaintiff was about twenty-one, and defendant twenty-three, years of age, in the city of Seattle, in March, 1897, the plaintiff's father, on whom he relied for guidance and counsel, was absent from the city; that throughout the year 1896, until about February, 1897, defendant was known to plaintiff as a lewd and reckless girl, who had with young men a promiscuous and unrestrained intercourse, and that on the 28th day of January, 1897, defendant procured and caused to be issued out of the justice's court a warrant for the arrest of plaintiff upon a charge of seduction, and caused the plaintiff to be arrested and imprisoned for one night; that plaintiff was without money at the time and without any person to consult with and confide in except his mother, who was in extreme distress over his imprisonment and urged him to do everything necessary to secure his release from such imprisonment, which his mother regarded as a disgrace to his family; that the plaintiff was the sole reliance of his mother and four minor children for support and maintenance; that plaintiff saw no other means of securing release than to intermarry with defendant, and they were married on the 29th of January, 1897. Paragraph 3 is

that a son, John Stanley, was born to defendant on the 28th of June, 1897. Paragraph 4 states that plaintiff strove to live with defendant in peace and harmony and be a good husband and kind father to the child, but from the day of the marriage, without intermission, until they separated on the 5th of July, 1897, to quote the allegation, "she was quarrelsome, vicious in disposition, murderous in threats against the plaintiff and his parents, hysterical and ungovernable in temper, crazy in her actions, and by her causeless and unprovoked boisterousness, screaming, hollooing and other wild conduct by day and night, an intolerable nuisance to all her neighbors;" that, although plaintiff's mother was uniformly generous and kind to defendant, defendant manifested no appreciation of such kindness, but, on the contrary, threatened to kill plaintiff's mother; that defendant frequently threatened to kill herself and child; that defendant grew up without education, training, discipline, guidance, or restraint of any kind, and is in reality an untutored person, incapable of reformation, and dangerous to herself and all around her; that she is wholly unfit to have the custody of the child, and it is not safe to leave the child with her; that plaintiff is in position to have good care taken of the child and is willing and anxious to do so; that plaintiff's mother takes a warm interest in the child's welfare, has a comfortable home, and is possessed of means to give the child a careful training and a good religious and secular education; that it is to the highest interest of the child that he be taken from the custody of the defendant and given into the custody of the plaintiff, who thereupon will place him in charge of his mother. Paragraph 5 is that after living five months with the defendant "and making every effort in good faith to pacify and civilize her and make her a respectable wife and mother," plaintiff gave up the

endeavor in despair, as entirely impossible of accomplishment, and has ever since the 5th of July, 1897, lived separate and apart from her; that, during the time plaintiff lived with her, she made his life a burden and subjected him, by her daily violence of speech, her vulgarity and coarseness of manners, and her total disregard of the decencies of life, to constant humiliation and disgrace in the eyes of his family, friends, and neighbors; that he and she can no longer live together. Paragraph 6 alleges there is no community property, and that neither spouse has any separate property or means. Paragraph 7 declares that it is to the best interests of the plaintiff, of the defendant, and of the child that the marriage be dissolved, and that the custody of the child be awarded to plaintiff, who is a fit and proper person. To the complaint the defendant filed a general demurrer, for the reason that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled. The first assignment of error is upon the ruling on the demurrer.

It is difficult to conceive any legal ground for divorce stated in the complaint. There does not appear any sufficient allegation of cruel treatment, which is the only ground intimated. The essence of the statement of the legal ground of cruel treatment is the specification of such facts as tend to establish injury to the health or person of the complainant. 1 Bishop, Marriage, Divorce & Separation, § 1537. It will be observed that the charges made against defendant state that she was quarrelsome and vicious in disposition and murderous in threats against the plaintiff and his parents. There is no specification of what those threats were, or how or when made, so that the court can conclude their effect; but the plaintiff concludes that defendant made herself an intolerable nui-

sance to all her neighbors. That might be humiliating to the plaintiff, but it would not be legal cause for divorce. The averment of threats against plaintiff's mother and want of appreciation of his mother's generous conduct, are of the same general character,—mere conclusions. The strong expression of defendant's defective education, training, and reckless girlhood, in view of the acquaintance of the plaintiff with, and knowledge of, defendant prior to the marriage, becomes immaterial. No rule is better established than that an ungovernable temper or reckless conduct previous to marriage, when all known to the plaintiff, are immaterial in a suit to dissolve marriage. Such dissolution can be made only upon grounds arising subsequently to marriage. That plaintiff believes he and defendant can no longer live together does not allege any ultimate legal cause. In *McDougall v. McDougall,* 5 Wash. 802 (32 Pac. 749), it was observed:

"The only theory upon which we can account for the action of the court below is that it came to the conclusion that, under all the circumstances of the case, the parties would not probably again live together as husband and wife, and from that fact assumed that it would be proper to decree a dissolution of the marriage bonds. . . . As our statute at present stands, it is not enough to authorize a decree of divorce that the court should find as a fact that the parties will no longer live together as husband and wife. It is necessary that there should be found to exist some of the causes mentioned in the statute in favor of the one as against the other party, and that the party in favor of whom such cause of divorce is found has not been guilty of like misconduct against the other party."

Again, the provision of our Code, "A divorce may be granted upon application of either party for any other cause deemed by the court sufficient, and the court shall be satisfied that the parties can no longer live together"

(§ 5716, Bal. Code), received construction in *Colvin v. Colvin,* 15 Wash. 490 (46 Pac. 1029). There the superior court found "that the parties cannot hence live together," and it was insisted that this finding invoked the discretionary power of the court to grant the decree under § 5716, *supra.* It was observed by the court:

"We do not think it was intended by the legislature that a divorce should be granted in every case wherein it should be found 'that the parties can no longer live together,' and where, as here, their failure to live together is due to their own obstinacy and stubbornness, we think a divorce should be denied. It is not the policy of the law that divorces should be granted merely because parties 'from unruly temper' or mutual wranglings live unhappily together. In order to have relief, it is not required that the party complaining should be wholly without fault for. the law recognizes the weakness of human nature, and measures the conduct of the parties by the standard of common experience. But where the parties to a divorce suit are *in pari delicto,* the conduct of each being a constant aggravation to further offense by the other, no divorce will be granted at the instance of either party."

And *Cate v. Cate,* 53 Ark. 486 (14 S. W. 675), is quoted with approval as follows:

"Unhappiness sufficient to render the condition of both parties intolerable may arise from the mutual neglect of the conjugal duties; but when the parties are thus at fault, the remedy must be sought by them, not in the courts, but in the reformation of their conduct. The remedy is in their own hands, and until it has been tried without effect by the party complaining, the courts will not give effect to the complaint. Until this home remedy has been tested and failed, the condition of each may be said to be due to his or her own acts, and one must bear the consequences of his own misconduct."

The matter in the second paragraph, preceding the marriage, is immaterial and affords no grounds for its disso-

lution. It seems to be the confession of a full grown man of his own delinquencies, and a plea of his lack of personal virtues in avoidance of such confession. We conclude that, as against the demurrer, the complaint was insufficient.

But upon an examination of the evidence given at the trial we are convinced plaintiff offered no substantial testimony to entitle him to a decree. He should have been nonsuited at the conclusion of his own testimony. He stated that he had known defendant seven years before the marriage, his family and hers living near each other during the whole time, and that he was well acquainted with her; that he was very intimate with her, and that he knew she was wild and reckless, and kept company with various young men, and was running around and sporting with them; that he knew she had borne a child some years before; and that he himself had been intimate with her; and that he married her to avoid a prosecution for seduction. He says that after the marriage he could not get along with her at all. The reason was her temper, quarreling, and threats. As to threats, he says she threatened to kill him and kill herself and kill her child; that these threats were made when she had "spells", two or three times a week, and that she used bad language, swearing and hollooing and screaming. He says she was somewhat hysterical, and it was impossible for plaintiff to stand that; that he tried to avoid quarrels with her, and that he himself was very good natured; that defendant's family were quarrelsome among themselves. The plaintiff, however, in his examination in chief, in answer to questions from his own counsel, gave much that was explanatory of these threats he testified to. The following question and answer give the true color of his testimony:

"Question: Now, you have mentioned these threats; just give the court fully all that you know about her making threats against herself and the child and anybody else.

"Answer: She would threaten to kill my mother. I don't know how many times she would make these threats, but I know two dates she did make these threats since 1 came back from Alaska. I went to her to see the baby, and talked to her, and she wanted me to live with her, and I told her I could not do it, and she said she would kill the baby and kill herself and kill me. That was the last day of June. The first day of July I went to see her again, and she said she would kill the baby, and wanted me to come into the house and see the poison she had bought. I told her, no, I wouldn't do it. I told her not to do anything like that. And she wanted to bring the poison out to me, and I wouldn't have it."

He further testified that he lived with her about five months after the marriage. A very few days before her confinement, plaintiff and defendant were ordered or sent from his father's house, and they occupied a wretchedly furnished room in an isolated house not far off, plaintiff still taking his meals and remaining most of the time at his father's, while defendant was alone, and he was absent when she was confined. He testified that the child was born on the 28th of June; that he left her on the 5th of July following; that he left her because at the time she was quarreling and complaining of him and threatening to kill his mother, and that in such a quarrel he left her, and did not return for over two years, when he went to see the child, and told her he would not live with her and wanted to be free from her, and she made the threat to kill herself and kill the child. It appears that plaintiff had practically contributed nothing to the support of the defendant at any time after the marriage. Plaintiff also testified that at the time of the marriage his family and defendant's were of about equal station. They were

then poor and lived by daily labor. Upon cross-examination, plaintiff again gives the true color surrounding the threats which he averred defendant made. In answer to what were the circumstances he answered: "Why, I and her were talking. I was trying to reason with her and trying to have her give me my freedom. And I told her how I was fixed. I had nothing. I told her I couldn't live with her. It was impossible. And she said she would kill herself and kill the child and kill me." He also testified directly that no suspicion of infidelity had arisen since marriage. It is apparent, without further reviewing the evidence of the plaintiff, that it states no facts which can fairly be construed into such cruel treatment as would occasion reasonable apprehension of personal violence; and surely he shows himself fully in delinquency in cause for irritation on the part of the defendant. He seems to have been absolutely recreant in every duty he owed to defendant as her husband. Under the rule in *Colvin v. Colvin, supra,* announced by this court, he is not entitled to any relief. The testimony also showed that plaintiff's father, with whom he was associated, had, since the marriage and plaintiff's desertion of his wife, acquired quite a competence in Alaskan adventure, and the family were quite well-to-do, and plaintiff's station in life much improved. Considerable testimony was heard for defendant and given by several witnesses, contradicting many of the statements of the plaintiff as to the conduct of his wife; and she denied all the material statements relative to herself. It appeared at the trial that the child, John Stanley, was a robust, healthy child. There was considerable testimony as to the suitableness of the defendant to retain his custody. There was some conflict in the opinions of the witnesses and perhaps some partisanship displayed. But it appeared that the defendant has been

a laundress for some considerable time, getting fair wages; that she is industrious and very fond of the child, and there seems to be no reason for interference with his custody, on the facts shown. Certainly, from the disclosures made by himself as well as admitted, the plaintiff is not a more suitable person to take care of the child than its mother.

The decree is reversed, with instructions to dismiss the cause.

DUNBAR, FULLERTON and ANDERS, JJ., concur.